## SANFORD CORPORATION v. COMMIS-SIONER OF INTERNAL REVENUE.
### No. 6993.

Circuit Court of Appeals, Third Circuit.
Sept. 21, 1939.

Theodore B. Benson and Charles E. Foster, Jr., both of Washington, D. C., for petitioner.

James W. Morris, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and Charles A. Horsky, Sp. Atty., of Washington, D. C., for respondent.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The case at bar is summed up in the language of the Prentice Hall Service as follows: "4831-A. Dividend of personal holding company held not paid within taxable year.—A personal holding corporation on a cash basis declared a dividend one day prior to the close of its fiscal year. Its sole stockholder, who alone had authority to pay out funds, was in a distant state and was not informed of the dividend until after the close of the fiscal year. He then wrote and cashed a check for the dividend. Held, the corporation did not pay the dividend within its taxable year and is not entitled to a deduction under section 351(b) (2) (C) of the Revenue Act of 1934, 26 U.S.C.A. § 331(b) (2) (C) (The Sanford Corp. v. Commissioner, 38 B.T.A. 139 (No. 19) pending before. C.C.A., 3rd Circuit)". Vol. 2, Prentice Hall 1939 Federal Tax Service, Personal Holding Companies, sec. 405, p. 4816.

We use this reference, first, because of its, as we think, accurate and succinct phraseology and, second, because we are reasonably assured thereby that our own research has not lagged in our (as well as counsels') failure to produce any binding precedent. The case is then one of first impression.

The provision of the Revenue Act under which it arises is decidedly not a matter of first impression. We have spoken elsewhere, Rothensies v. Cassell, 3 Cir., 103 F.2d 834, of what might be called the reverse patriotism of tax avoidance (we use the more polite and therefore mayhap less expressive term). One of the earliest methods (again we avoid the harsher word) employed to that end was what came to be known as "the incorporated pocket-book". A partial list of these ghostly receptacles was introduced in the hearings on the Revenue Act of 1937, 50 Stat. 813, Hearings before the Joint Committee on Tax Evasion and Avoidance, Part 1, p. 186, and makes interesting reading. As long ago as the Act of 1913, 38 Stat. 114, the obviousness of putting our old friend, the corporate fiction, to another use having the aroma of impropriety, was envisaged. In 1918 we find the Secretary of the Treasury saying: "The corporate form of organization is now used or abused by wealthy individuals who incorporate their personal business and investments and thus escape surtaxes upon that amount of their income which is reinvested or saved". Sherman, Taxation of Corporations Used to Avoid Taxes Upon Stockholders, Vol. 13, The Tax Magazine, p. 19; and in 1933 the responsible committee of the House of Representatives: "Perhaps the most prevalent form of tax avoidance practiced by individuals with large incomes is the scheme of the 'incorporated pocket-book'. That is, an individual forms a corporation and exchanges for its stock his personal holdings in stocks, bonds or other income-producing property. By this means the income from the property pays corporation tax,

but no surtax is paid by the individual if the income is not distributed. * * * there seems no doubt that this form of avoidance is still practiced to a large extent". Preliminary Report of a Subcommittee, transmitted to the Committee on Ways and Means, December 4, 1933, Sherman, Taxation of Corporations Used to Avoid Taxes Upon Stockholders, above cited, p. 19.

As a result of this latter opinion, the Congress finally abandoned the milder methods of the earlier revenue acts and enacted the personal holding company section with which we are now dealing, 26 U.S.C.A. § 331. This statute is automatic and supposedly drastic in its operation. It seeks to prevent the method (device) of tax avoidance (evasion) so clearly described in Sherman's article, above cited:

"Essentially this method of tax avoidance does not effect a complete avoidance of tax on the part of the individual stockholder, but merely a postponement or deferment of part of the tax. For, if the holding company should distribute its earnings or surplus in future years, the stockholder would then have to pay a surtax on the dividends that he received. However, a complete or partial avoidance of tax may ensue upon the happening of any of the following events:

"1. If the corporation should spread the distribution of its annual income over a series of years, a real saving in tax would accrue to the stockholder from the mere fact that his distributive share of the income would fall in the lower surtax brackets.

"2. If the corporation should time the distribution of its income so that it is made during a year when the stockholder has personal losses of other deductions to offset against the dividend received, a real saving in tax would result.

"3. If there should be a reduction in tax rates upon individual incomes during any future year, the distribution of the corporate income in such year would result in an actual saving to the stockholder.

"4. If the corporation should incur any losses on its investments or otherwise, which deplete the earnings or surplus accumulated during preceding years, there will be an avoidance of tax, for the Government will be deprived of the surtax which the stockholder would have had to pay, had the corporation made a distribution of its annual income in the year when

the same was earned". Sherman, Taxation of Corporations Used to Avoid Taxes Upon Stockholders, Vol. 13, The Tax Magazine, 19, 20.

Mr. Paul, a leading tax specialist, in writing on the Revenue Act of 1937, 50 Stat. 813–818, points out that the ineffectiveness of the 1934 and similar subsequent measures necessitated the final imposition of what he refers to as a "death sentence":

"The personal holding company provision of the statute, in a sense, legitimatized personal holding companies by imposing a penalty tax upon their undistributed adjusted net income. The domestic personal holding company was an 'incorporated pocketbook' in the same manner as a foreign personal holding company; its advantage was, however, not dubious absence from jurisdiction, but an effective rate of tax lower than the individual surtax brackets of its stockholders. A domestic personal holding corporation did not conceal; it revealed and paid the statutory price.

"The illusory quality of the personal holding company tax rates is definitely proved by the experience of the Treasury in the years 1934, 1935, and 1936. Notwithstanding nominal rates of 8% to 48%, the preliminary report on 1935 returns showed the collection of less than $2,000,-000 on personal holding company income of approximately $115,000,000.

*    *    *    *    *    *

"* * * It must be admitted that this personal holding company device constituted in most cases a successful tax avoidance mechanism. There will, no doubt, be cases which will show that what is claimed to have been done in connection with personal holding companies was not done, but where much of the income tax law rests upon the base of corporate entity, and where there is a genuine transfer to a personal holding company, and the law imposes a penalty tax on the personal holding company on the theory that it is a separate corporation, the only thing left is to repair by an amendment damage suffered from statutory over-generosity.

"A death sentence is pronounced against the use of these holding companies as a tax avoiding device by the provisions of the 1937 Act, which completely rewrite Title IA of the Revenue Act of 1936". Paul, The Background of the Revenue Act of 1937, 5 Chicago Law Review 41, 59–60, 62.

As to the 1934 Act, see also, Tyler and Ohl, The Revenue Act of 1934, 83 University of Pa. Law Review 607; Latham, Taxation of Capital Gains, Tax Avoidance and Other Problems Under the Revenue Act of 1934, 23 California Law Review 30.

The avoidance lies in the corporation's failure to distribute. That keeps revenue from the state and all political scientists agree is harmful. Some economists feel that this same failure to distribute reduces purchasing power and is unsound. That view resulted in the passage in 1936 of an act imposing a surtax on undistributed profits, 26 U.S.C.A. § 104, Hendricks, The Surtax on Undistributed Profits of Corporations, 46 Yale Law Journal 19, 20; Stempf, New Factors in Federal Income Taxation, 62 The Journal of Accountancy 242, 249; Fernald, The Tax on Undistributed Profits Imposed by the Revenue Act of 1936, 7 The New York Certified Public Accountant 22, 31.

It will be observed that in both the undistributed profits surtax act and the one under consideration, the dividends credit provision employs the word "paid". To relieve from tax under the circumstances of the case at bar, it is necessary to interpret the verb against its literal meaning by adding thereto the adverb constructively. Generally speaking, any extension of the unreal doctrine of attaching consequences by the fiction of a constructive something or other (abandonment, contempt, delivery, eviction, notice, possession, seizure, service or trusts, for instance) is embarrassing to a proper development of the law. In the revenue field we already have, however, such extensions in the form of constructive receipt, Holmes, Federal Income Tax, (6th Ed.), sec. 263, p. 494; Klein, Federal Income Taxation, par. 6:23, p. 122, par. 6:23(d) p. 125. The learned tax specialist, from whom we have already quoted, and his collaborator in their Law of Federal Income Taxation, criticize the Treasury for inconsistency in contending for a doctrine of constructive receipt and refusing to make a similar ruling, T.D. 4674, of constructive payment under 26 U.S.C.A. § 104. They say at page 312 of the 1938 supplement:

"Further problems arise in connection with the doctrine of constructive receipt. Suppose a corporation declares a dividend and pays it to its sole stockholder by entering the dividend as a debit on its books. Will such a corporation be entitled to a dividends paid credit on the theory that since the corporation is able to pay the dividend, there is a constructive receipt to the recipient and a constructive payment by the distributing corporation? Certainly there should be proper inter-relation as respects the taxable year between taxable dividends in the hands of recipients and the allowance of dividends paid credits. * * *

"The fact that the dividend is constructively received by the stockholder should make it constructively paid by the corporation. Perfect inter-relation between the treatment accorded to corporation and the treatment accorded to stockholder is impaired in the 1936 Act by placing the dividends paid credit on a cash or payment basis with disregard of accruals. But there is a distinction between the doctrine of accrual and the doctrine of constructive receipt. Constructive receipt is the equivalent for income tax purposes of actual receipt, and by the same token constructive payment should be the equivalent of actual payment. The accrual doctrine has nothing to do with the case and should not be permitted to obscure the simple fact that in point of law a payment has been made. Corporations should be permitted a dividends paid credit in all cases in which a dividend has been made constructively receivable by stockholders". Paul and Mertens, Law of Federal Income Taxation, Vol. 3, sec. 32A.24 pp. 312-313, 1938 Supp.

The same learned authors do not indulge in the same criticism in their section discussing dividends paid by personal holding companies, 32A.22A. They say on the contrary: "The dividends paid credit allowable to personal holding companies is governed by the basic condition underlying the allowance of this credit,—that the dividends paid must have been paid to, received by, and taxable to, shareholders in the year in which the credit is allowed to the distributing corporation". Paul and Mertens, Law of Federal Income Taxation, Vol. 3, sec. 32A.22A, p. 309, 1938 Supp.

That "basic condition" is, of course, the emptying of the "incorporated pocketbook", a different purpose from the prevention of accumulated corporate surpluses.

The decision of the Board of Tax Appeals is affirmed.