## COMMISSIONER OF INTERNAL REVENUE v. TENNESSEE CO.

### No. 7269.

Circuit Court of Appeals, Third Circuit.

March 28, 1940.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Berryman Green, and Ellis N. Slack, Sp. Assts. to Atty. Gen., for petitioner.

Paul Patterson and John C. Morley, both of Cleveland, Ohio (Baker, Hostetler & Patterson, and R. T. Sawyer, Jr., all of Cleveland, Ohio, and Charles H. Owsley, of Youngstown, Ohio, of counsel), for the taxpayer.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The case at bar is one of first impression, 402 C.C.H. para. 1684B, and cf. Hughes & Co. v. Commissioner, 8 Cir., 109 F.2d 720, involving the surtax imposed on personal holding companies by the Revenue Act of 1934, § 351, 26 U.S.C.A.Int.Rev.Acts, page 757. That measure, as we had recent occasion to observe in Sanford Corp. v. Commissioner, 3 Cir., 106 F.2d 882, certiorari denied, February 5, 1940, 60 S.Ct. 513, 84 L.Ed. ——, is directed to the more efficient elimination of certain methods of tax avoidance. The employment of one of these methods is clearly discernible in the record before us. It was well-known to students of the earlier, but ineffectual avoidance provisions of the Revenue Acts, and consists in using the "incorporated pocketbook", to gain a tax advantage in the purchase of capital assets on credit. See Sherman, Taxation of Corporations Used to Avoid Taxes Upon Stockholders, 15 Tax Magazine 19, 78, 79; United Business Corporation v. Commissioner, 19 B.T.A. 809.

The device is simple. Suppose Mr. X wishes to purchase a $1,000,000 apartment house subject to a $900,000 mortgage. If he does so, he must pay surtaxes on the apartment house rents calculated without

deduction of amounts paid in satisfaction of the mortgage debt. Those surtaxes may, however, be escaped by the easy expedient of substituting the indirect and lesser burden of the flat rate corporation tax. To quote by way of illustration:

"Mr. X forms the A Corporation. He transfers to it $100,000 with which it purchases apartment houses of the value of $1,000,000 with mortgage encumbrances to the extent of $900,000, due in twenty years. The property gives A Corp. a net income of $10,000 a year, but no dividends are declared in the next twenty years, as it is necessary to provide for the forthcoming maturity of the mortgages. At the expiration of the twenty years A Corp. pays off some $300,000 of the mortgages, renews the balance for another twenty-year period and continues to accumulate for the next maturity date. Sound business practice? Beyond doubt; every conservative business man would feel inclined to adopt a similar policy if he could afford it. Mr. X need not buy real estate to achieve this result; he can get the same result by purchasing a factory or a railroad heavy in debt to bondholders. It is even conceivable that he will have A Corp. buy securities in the stock market on the strength of a long term loan, backed by his personal signature if necessary." Graubard, Accumulation of Surplus to Avoid Surtaxes, 10 Tax Magazine 415, 418. And, we may add, when stocks are so substituted for apartment houses (as in our circumstance) the A Corporation is exempt from tax on the dividends received, and the avoidance becomes complete.

To combat such arrangements of the taxpayer's affairs, the statute limits the only applicable deduction from the taxable "undistributed adjusted net income" of the holding company to: "Amounts used or set aside to retire indebtedness incurred prior to January 1, 1934, if such amounts are reasonable with reference to the size and terms of such indebtedness." Section 351(b) (2) (B), 26 U.S.C.A.Int.Rev.Acts, page 757. In other words, the stratagem of cancelling an incorporator's income with his corporation's debt for the source of that income, is killed instantly if born later than 1934; but, if born earlier, it lives on to die a natural death upon the eventual satisfaction of the debt. The peculiar variant of that stratagem instanced by the case at bar forces us into a perplexing choice between these alternative fates.

The respondent corporation was organized in May 1933. It had a capital of $150,000 in cash represented by 3,000 shares of no par value stock, all held by the W. W. Hawkins Company. The following December respondent received an "advance" of $153,600 from the Hawkins Company, acquired all the stock of the Memphis Commercial Appeal Inc., a newspaper, for $303,600 (including interest), received an "advance" from the Roy W. Howard Company of $149,000, and returned $149,000 to the Hawkins Company, its sole stockholder, pursuant to a duly authorized reduction in capital stock. Thereupon one Hammond, an assignee of the Hawkins Company, emerged as controlling stockholder. Thus respondent entered the year 1934, as a personal holding company, and, true to form, applied substantially all the dividends received from the Memphis Commercial Appeal Inc. Stock, during that year ($97,000) to the reduction of the "advances" made by the Hawkins and Howard companies. We say true to form because, as can easily be seen, Hammond had in substance through the medium of the respondent corporation merely bought a newspaper on credit and was paying for it out of its own earnings. Even more true to form was the nature of the obligation to repay the "advances". In short, respondent promised, on December 22, 1933, to pay them back out of its net earnings (Memphis Commercial Appeal dividends), when, as, and if those earnings came into existence, and not otherwise except at its own option. The technical question, therefore, is whether such a contingent liability assumed in 1933 and which becomes a due debt in 1934 is an "indebtedness incurred prior to January 1, 1934" within the meaning of the statute.

■ If anything is well settled it is that the term "indebtedness", when used in a statute, lacks the fixed import of a word of art. Its meaning may be either broad or narrow. As stated in a standard source:

"B. *Strict Meaning.* In its strict legal significance, the word 'indebtedness' applies only to an obligation arising from contracts, express or implied, and in this sense it is defined to be a sum of money due by certain and express agreement; that for which an action of debt will lie; the owing of a sum of money upon a contract or agreement, and, in common understanding, it is not less an indebtedness that such sum is uncertain. * * *

"C. *Broad Meaning.* The term 'indebtedness' has at times a signification far broader than the law dictionaries assign to it, a more general and common meaning, being often used in the large and general sense, and not in its technical one, not even involving of necessity the idea of money obligation. In its more general sense it is defined to be that which is due from one person to another; that which one person is bound to pay or perform to another. In this sense, it may include every obligation by which one person is bound to pay money, goods, or services to another. * * *"

31 C.J. 412, 413.

"Indebtedness", accordingly, may comprehend a contingent liability. If used in the liberal sense, it does; if used in the strict sense, it does not. As is to be expected, the only possible criterion of choice between these two conflicting interpretations of the word is the aim of the enactment which employs it. See 3 Paul & Mertens, Law of Federal Income Taxation § 24.05 (income tax deduction for interest on indebtedness); 6 McQuillan, Municipal Corporations §§ 2377, 2388, 2428 (constitutional debt limit for municipalities); 6 Williston on Contracts § 1998 et seq. (bankruptcy statutes).

The raison d'etre of the instant statute is explained in general terms by its framers: "Considerable hardship has been avoided by permitting the deduction from the adjusted net income of a reasonable amount used or set aside to retire indebtedness incurred prior to January 1, 1934. This will substantially and properly relieve personally owned corporations which have outstanding bonds or other indebtedness that must be met from current earnings before distributions can be made." Senate Rep. No. 558, 73rd Cong., 2d Sess., p. 15.

The background for this action is described by Dr. Magill in his testimony before the House Ways and Means Committee in 1937: " * * * In 1934 the Congress adopted a new approach to this problem by the insertion in the law of section 351. The essence of this section was to define precisely the personal holding companies which would be subjected to the special surtaxes which the section imposed. It was not then known precisely how the section would operate, and accordingly various cushions were adopted to meet cases of anticipated hardship." Hearings Before Committee on Ways & Means, House of Representatives, 75th Cong., 1st Sess., p. 27.

Dr. Magill went on to recommend (on behalf of the joint Committee on Tax Evasion and Avoidance) that the retirement of indebtedness provision be repealed, because in many cases it afforded a means of preventing the distribution of earnings to stockholders contemplated by the personal holding company section. The suggestion, however, did not persuade the legislators. The Ways and Means Committee reported on the Revenue Act of 1937: " * * * While recognizing the reasons which impelled the joint committee to make this recommendation, your committee feels, from further study of the question, that the denial of this deduction would cause hardship in numerous cases where, due to the particular circumstances of the corporation, a dividend distribution cannot be made because of a necessity for legal reasons of using the earnings and profits to discharge the debts. Moreover, any loss of revenue caused by the continued allowance of this deduction cannot increase, since indebtedness incurred after 1933 cannot be used as a basis for the deduction. No corporation can be formed for the purpose of taking advantage of this deduction. Furthermore, it is inevitable that the revenue loss must decrease as pre-1934 debts are retired. It is the hope of your committee that further study of the problem will disclose a solution whereby the deduction may be denied in the usual case but permitted in case its denial seems unjustifiable. * * *" H. Rep. No. 1546, 75th Cong., 1st Sess., pp. 12-13.

The Senate Finance Committee not only agreed with their colleagues in the House, but also revised the measure so as to read: "Amounts used or irrevocably set aside to pay or retire indebtedness of any kind incurred prior to January 1, 1934 etc." 50 Stat. 813. In extenuation, they said: " * * * The insertion of the words 'to pay' and 'of any kind' are clarifying amendments to existing law, some controversy having arisen as to the intent of such law. * * *" S.Rep. No. 1242, 75th Cong., 1st Sess., p. 2.

We have, therefore, a statute directed to the type of avoidance availed of by Hammond. That avoidance, however, may go hand and hand with sound business practice. That is to say the statutory definition of the personal holding company, section 351 (b) (1), 26 U.S.C.A.Int.Rev.Acts, page 757; may include corporate enterprises whose functions extend beyond those of incorpo-

rated pocketbooks into the field of genuine commercial activity. In order to avoid possible hardship to such hybrid organizations the operation of the statute is "cushioned" so as to make it prospective in the case of debt retirement payments. Subsequent events indicate that the cushion was intended to be a large and soft one. At the same time the Congress recognized imperfections inherent in that kind of cushion, but did not consider it worth while, or know how, to correct them.

We think the case at bar is a clear illustration of one of those imperfections. Respondent's contingent obligation to repay was by the very nature of the contingency one most calculated to accomplish avoidance, and least fitted to implement any sound practice in corporate financing by means of the debtor-creditor relationship. The imposition of the surtax on income undistributed by reason of such an obligation is far removed from the variety of hardship envisaged by the Congress. On the other hand, it is easy to imagine contingent obligations, dictated by sound business practice, whose satisfaction would excuse non-distribution on persuasive grounds of hardship. The obligation of surety or indorser, incurred in proper furtherance of the corporation's interest comes to mind at once. But the statute does not speak in terms of sound business practice. It puts forward the sole test of "indebtedness", which means "indebtedness of any kind". Much as we would like to, we cannot, in applying that test, drive a distinction between a promise to pay if someone else does not (surety) and a promise to pay if someone else does (respondent). If "indebtedness" signifies a contingent obligation in the one case it does in the other. And it is plain, we must confess, that the Congress in its declared effort to prevent hardship even at the cost of permitting unjustifiable avoidance, used the word in its broad meaning. So we must await the happy day when pre-1934 indebtednesses are finally extinguished. Until then (or until the Congress follows the lead of Parliament [1]) the most extreme corporate schemes of avoidance may rejoice with the deserving objects of Congressional solicitude.

The decision of the Board of Tax Appeals is affirmed.

[1] Analogous but more explicit legislation has long been in effect in England. See, Report of the Royal Commission on the Income Tax (Cmd. 615, 1920) p. 125; The Finance Act, 1922 (12 & 13 Geo. 5, C. 17) Part II, § 21, as amended by the Finance Act, 1927 (17 & 18 Geo. 5, C. 10) § 31, and the Finance Act, 1936 (26 Geo. 5 & 1 Edw. 8, C. 34) § 21; Konstam. The Law of the Income Tax, 355, 366; 17 Halsbury's Laws of England pp. 289 et seq.; and cf. Income Tax Codification Committee Report (Cmd. 5131, 1936) p. 234. It is interesting to observe that the Finance Act of 1927 specifically allocates to the distributable income of private companies sums expended in the purchase of the business the company was formed to acquire, "otherwise than in pursuance of an obligation entered into before the fourth day of August, nineteen hundred and fourteen". So only prewar—i. e., pre *high surtax*—obligations can work any exemption. See 208 Parliamentary Debates (Commons) 994, 995, and cf. 948, 949. As instanced by a remarkably apposite case, Glazed-Kid Ltd. v. The Commissioners of Inland Revenue, 15 Tax Cases 445, 457, the respondent at bar would be subject to the English surtax either as a private company, or, a fortiori, as an "investment company". The same would seem to be true in Australia, Ratcliffe, McGrath, and Hughes, The Law of Income Tax 702 et seq.