**CHESS & WYMOND, Inc., v. GLENN, Collector of Internal Revenue.**

No. 176.

District Court, W. D. Kentucky, Louisville Division.

Sept. 6, 1941.

Chas. G. Middleton, Chas. G. Middleton, Jr., and Crawford, Middleton, Milner & Seelbach, all of Louisville, Ky., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew W. Sharpe and Arthur L. Jacobs, Sp. Assts. to the Atty. Gen., and Eli H. Brown, III, U. S. Dist. Atty., of Louisville, Ky., for defendant.

MILLER, District Judge.

The plaintiff Chess and Wymond, Incorporated, brought this action against the defendant Collector of Internal Revenue to recover $46,208.85 with 6% interest from December 15, 1939, which it claims was illegally assessed against the plaintiff for its taxable year ending March 31, 1937. The tax was paid under protest and refund thereafter denied.

### Findings of Fact.

The plaintiff Chess and Wymond, Incorporated, was organized under the laws of Delaware on May 15, 1933, and maintained its principal place of business in Louisville, Kentucky. It engaged in the manufacture and sale of beer kegs. In December, 1933, after the repeal of prohibition it became engaged in the manufacture and sale of tight cooperage for the storage of Bourbon whiskey, which business it has continuously carried on since that time. Due to the necessity of aging and drying out the white oak staves and heading, which were used by the plaintiff in manufacturing whiskey barrels a large investment in inventory was required. Its capital was only $100,000. One of its large Eastern customers loaned it approximately $450,000 but in the Spring of 1935 this loan was repaid and other credit arrangements had to be made. In the early part of December, 1935, W. I. Wymond, president of the plaintiff, negotiated a large contract in New York with the Schenley interests and upon his return to Louisville immediately discussed with the First National Bank of Louisville the ways and means of financing the increased business in 1936. The plaintiff requested a line of bank credit in the amount of $500,000 to be evidenced by 90-day notes at an agreed rate of interest as the money was needed. It was contemplated that the credit, if extended, would be divided between three participating banks, namely, First National Bank of Louisville, First National Bank of Cincinnati, and the Commercial National Bank and Trust Company of New York. The First National Bank of Louisville acted as the representatives of all three banks. The plaintiff had also taken steps to readjust and increase its capital structure so that it would have outstanding $400,000 of 7% preferred stock in addition to 400,000 shares of common stock at the par value of 5 cents. D. W. Potter, vice president of the First National Bank of Louisville, handled the negotiations for the bank. Mr.

Potter objected to the payment by the plaintiff of dividends upon its preferred stock while the plaintiff was indebted to the banks, but Mr. Wymond insisted that in view of the recapitalization being put through at that time it was necessary that dividends be paid upon the preferred stock so issued. All necessary details of the proposed line of credit were discussed but no commitment on the part of the banks was made at that time. Potter advised Mr. Wymond and Mr. Thomas Helm, vice president of the plaintiff, who was also present at the conference, that the plaintiff's proposition would be submitted to the discount committee of the bank, which was promptly done. The bank's discount committee authorized the loan subject to certain conditions, and following the meeting Mr. Potter on behalf of the First National Bank and in accordance with the action of the discount committee, wrote the following letter to the plaintiff:

"First National Bank
"Louisville, Ky.
"December 18, 1934
"Mr. W. I. Wymond, President
"Chess & Wymond, Inc.
"Louisville, Kentucky

"Dear Bill:

"We understand from our recent conversation with you that if a 500,000 barrel contract is signed with Schenley next spring that your production will be stepped up to approximate an annual rate of 800,-000 barrels, necessitating bank credit of $500,000.00. With the usual reservation with reference to maintenance of a satisfactory financial condition, we are willing to participate in such a credit to the extent of one-third, provided:

"1. A satisfactory contract can be entered into with Schenley substantially along the lines of your present contract, but containing a provision of notice which will adequately protect you on the increased inventory position which you assume for this account.

"2. Your capital structure is readjusted along the lines discussed to a $400,000 7% Preferred issue; Common stock to constitute the rest of your capital liability.

"We understand that you feel obligated to declare and pay preferred dividends on your new issue requiring $28,000 per year. While we feel that it is wrong in principle for stockholders to withdraw money from this company in view of its present need, the amount is relatively small in relation to the contemplated earnings. We would definitely oppose the payment of such dividends, however, should the earnings fall under $30,000 per quarter.

"With kindest personal regards, I am,
"Very truly yours,
"D. W. Potter,
"DWP:f                  Vice President"

This letter was duly received by the plaintiff and was answered by Mr. W. I. Wymond, its president, on December 19, 1935 as follows:

"December 19, 1935
"First National Bank,
"Louisville, Ky.
"Attention Mr. D. W. Potter
"Dear Doug:
"Thanks very much for your letter of December 18 which will be very helpful and is greatly appreciated.
"Thanking you for your cooperation,
"Sincerely,
"WIW:NS              W. I. Wymond"

This answer was duly received by the First National Bank. Thereafter on December 28, 1935, the plaintiff secured its amended charter and put into effect its proposed recapitalization as outlined in the bank's letter of December 18, 1935. On January 15, 1936, the plaintiff successfully completed its negotiations with Schenley and entered into a written contract with that Company as previously contemplated and in accordance with the provisions of the bank's letter of December 18, 1935. The $500,000 line of credit was made available to the plaintiff by the three participating banks and was substantially used by the plaintiff. From April 1, 1936, to October 1st, 1936, the indebtedness totalled $450,000. On December 1st, 1936, it had declined to $375,000 at which figure it remained through March 31, 1937, the close of the plaintiff's fiscal year for which the tax herein litigated was assessed. At no time during the fiscal year under consideration was the indebtedness paid off, or was the plaintiff able to repay the same because of the lack of available funds. On and after April 1, 1936, the plaintiff paid dividends on its outstanding preferred stock on the following dates: April 1, 1936, July 15, 1936, October 3, 1936, January 8, 1937, March 26, 1937 and July 8, 1937. Since July 8 1937, the plaintiff has not paid any dividends upon its preferred stock. Plaintiff has not paid any dividends upon its common stock.

On June 17, 1937, the plaintiff filed its Federal income tax return for its fiscal year ending March 31, 1937. In this return the plaintiff claimed exemption from any liability for surtax on undistributed profits, by reason of the provisions of Section 26(c) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 835. By registered letter of November 20, 1939, the Commissioner of Internal Revenue notified the plaintiff of a determination of a deficiency in its income tax liability for the taxable year ending March 31, 1937, in the amount of $40,181.61, and a deficiency in excess profits tax liability in the amount of $258.38. On December 15, 1939, the plaintiff paid said deficiency in income and excess profits taxes, together with interest due on said income tax deficiency in the sum of $6,027.24, together with interest on the deficiency in excess profits tax in the amount of $38.76. On January 4, 1940, the plaintiff filed a claim for refund of $46,208.85, as an alleged overpayment of income tax and interest thereon for the taxable year ending March 31, 1937. By letter dated May 10, 1940, the plaintiff was notified that the claim for refund was rejected. The filing of this action followed on May 27, 1941.

## Conclusions of Law.

Section 14(b) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 823, levies upon the net income of every corporation a surtax at graduated rates. This tax is computed upon such portions of the undistributed net income as is in excess of certain percentages of the adjusted net income. Section 26(c) (1) of the Revenue Act of 1936 provides for the allowance of a credit to the extent of "an amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * *" The plaintiff contends that under the foregoing facts it had executed a contract which complied with the requirements of Section 26(c) (1) and therefore is entitled to the credit provided by that section. The defendant contends that the plaintiff has not complied with the requirements of that section and is accordingly not entitled to the credit claimed.

Defendant first contends that the exchange of letters of December 18, 1935, and December 19, 1935, between the First National Bank and the plaintiff did not constitute a written contract, within the provisions of the exemption section but was merely a memorandum of an oral agreement previously consummated. He points out that the letters are indefinite as to the amount and terms of the loan, and are so lacking in other details that they fall far short of constituting a definite offer and acceptance. He contends that if there was any agreement between the parties it was an oral agreement previously entered into between the plaintiff and the bank when Mr. Wymond and Mr. Helm discussed the matter with Mr. Potter, the bank's representative. The evidence, which is uncontradicted, refutes this contention. The witnesses definitely stated that at the time of the conference the terms of the financing were discussed and submitted to the bank in the form of an offer, but that Mr. Potter made no commitment. On the contrary, he advised the plaintiff's officers that the matter would be submitted to the bank's discount committee for its approval or rejection. The plaintiff's proposition was considered by the discount committee, and met by a counter-proposition as set out in Mr. Potter's letter of December 18, 1935. It is obvious that this was a counter-proposition rather than an acceptance of the plaintiff's proposition by reason of the injection by the bank into the negotiations of its opposition to the payment of preferred dividends in the event the earnings of the plaintiff should fall under $30,000 per quarter. This was a new condition not previously agreed upon in the oral negotiations. This counter-proposition was satisfactory to the plaintiff and accepted by it in its letter of December 19th. It is true that this written agreement did not recite the numerous details of the proposed loan, and such details would have to be supplied from the previous verbal negotiations, but defendant's contention that the agreement does not comply with the statutory requirements for that reason fails to properly analyze the provisions of the statute under consideration. Section 26(c) (1), granting the credit, does not require that there be a written contract setting forth the terms of the line of credit to be extended, but it merely requires that there be a written contract dealing with the payment of divi-

dends. The agreement as evidenced by the exchange of letters deals specifically and in detail with the payment of dividends, and accordingly complies with the provisions of the statute, even though details as to the proposed loan are lacking. The agreement is accordingly a written one dealing with the payment of dividends and executed (on December 19, 1935) prior to May 1, 1936, which complies with three of the statutory requirements. It remains to be considered whether or not it complied with the fourth requirement that the plaintiff be prevented by reason of the contract from paying dividends during the taxable year in question.

Defendant contends (1) that the plaintiff's letter of December 19th was merely an expression of appreciation which did not obligate the plaintiff in any way; (2) that even if it be construed as agreeing to the bank's proposition of December 18th, yet that proposition did not prohibit the payment of dividends but merely stated the bank's position of being opposed to the payment of dividends; and (3) that even if construed as a contract obligation on the part of the plaintiff not to pay dividends yet its terms are restricted to the payment of preferred dividends and are not broad enough to prohibit the payment of dividends on common stock. These three objections stand or fall depending upon the construction given to the agreement between the plaintiff and the bank as evidenced by the exchange of letters. A strict literal construction of the words used would probably sustain the defendant's contentions, but I am of the opinion that such a construction is not authorized or justified by the circumstances surrounding this case and the enactment of the statute in question. It will be noticed that the statute was enacted on June 22, 1936, which was more than six months after the agreement under consideration was entered into. If the statute had been in existence at the time of the negotiations between the plaintiff and the bank, it would have been comparatively easy to have executed a written contract complying in every respect with the provisions of the statute, and no doubt attention would have been given to precisely meeting those requirements. In such a case the formal contract should be strictly and literally construed. But the Court should consider the question from a much more liberal viewpoint when it analyzes a written agreement, informally entered into without intending to comply with any statutory requirements, because none existed, and without any thought or suggestion that it would be later tested for exact compliance with the provisions of a statute subsequently enacted and that it would be declared invalid if it did not meet that pattern in every detail. As was pointed out by Chief Justice Hughes in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, at page 41, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352, the Court should not shut its eyes to the plain facts and deal with the question in an intellectual vacuum. The Court should give great weight to the fundamental rule used in construing any written instrument, namely, that it should be construed according to the intention of the contracting parties as gathered from the words of the entire instrument and from the circumstances surrounding the parties at the time when the written agreement was made. It is evident that the plaintiff's letter of December 19 was intended as an acceptance of the bank's proposal, rather than a non committal expression of appreciation. It contained no expression of disappointment, which certainly would have existed if the credit had not been obtained. It made no counter proposition or suggestion for a further conference. On the contrary, it expressly thanked the bank for its cooperation. Prospective borrowers do not consider a bank as cooperative when an application for a loan, often a corporate life or death matter, is refused. Although there are no promissory expressions contained in this letter, there can be but little doubt that the plaintiff knew it was expected to live up to all the conditions stated in the letter and was obligating itself to do so when it accepted the line of credit. The bank's statement that it "would definitely oppose the payment of such dividends" indicates very clearly its intentions in the matter. I have no difficulty in understanding such diplomatic language on the part of the bank. The loan would not be continued if its views in this respect were not complied with, and in return for extending the credit it expected such compliance. The condition was a reasonable one and to be expected. The intention of the contracting parties is clearly seen even through the cloak of diplomacy as shown in the exchange of letters. It is controlling in the decision of this case. The Court finds that the plaintiff's letter of December 19th was an acceptance of the bank's proposi-

tion outlined in its letter of December 18th, and that the bank's proposition included a restriction against the payment of all dividends of every kind except dividends on the preferred stock so long as the plaintiff's earnings did not fall under $30,000 per quarter.

The subsequent conduct of the parties confirms this conclusion. The plaintiff completed its contract with Schenley along the lines indicated by the bank, which it certainly would not have done unless it felt it had a commitment for a bank credit of $500,000. It completed the readjustment of its capital structure as outlined by the bank. The $500,000 line of credit was made available and was used. It paid dividends on its preferred stock only for a comparatively short period of time, and thereafter discontinued the payment of such preferred dividends. It paid no dividends on its common stock. Most of these actions on its part were before the passage of the Revenue Act of 1936, and therefore indicate the plaintiff's unbiased judgment as to its rights and obligations in its relationship with the bank.

Although the bank's letter expressly refers to the question of dividends on the preferred stock only, yet it would be a very strained construction to hold that the bank was countenancing the payments of any other dividends, such as cash dividends on the common stock or stock dividends. The bank's willingness to permit payment of preferred dividends only within specified limits clearly implies, in view of the relationship existing between the parties, its unwillingness to permit the payment of any other kind of a dividend. Giving effect to this implied term of the contract does not prevent the contract from complying with the provisions of Section 26(c) (1), which requires that there must be a written provision which "expressly deals with the payment of dividends." This does not say that every term of the contract must be an express one, and that implied terms are not to be given effect,

but it merely means that the question of dividends in general must be expressly dealt with. The purpose of the statute was to prevent taxpayers from attempting to defraud the Government by relying upon oral contracts which may or may not have dealt with the payment of dividends. As was pointed out in Northwest Steel Rolling Mills v. Commissioner of Internal Revenue, 9 Cir., 110 F.2d 286, 288, "it is a comparatively easy matter for the Bureau of Internal Revenue to ascertain whether an ordinary written contract prohibits payment of dividends. But it would be an almost insuperable burden for the Bureau to determine the validity and scope of oral contracts of that nature." A written contract expressly dealing with the payment of certain dividends and which leaves to the Court the question of construing what is properly and reasonably implied from those express terms complies with the purpose and intent of that provision of the section.

The history of the Act also lends support to the foregoing views. Its objectives were to prevent the accumulation by corporations of large undistributed profits by a graduated tax on profits not disbursed as dividends, and to provide additional taxes by taxing these profits in the hands of stockholders when received by way of dividends. It was not the purpose of the statute to penalize a corporation which had a legitimate need for using its profits and retained them for that purpose instead of declaring a dividend. The plaintiff has not violated the purposes of the Act. The operation and effect of the Act proved unsatisfactory and it was repealed in 1939. If consistent with the facts, the Court should avoid a construction which would penalize and impose an unjust hardship upon the taxpayer. Burnet v. Guggenheim, 288 U.S. 280, 285, 53 S.Ct. 369, 77 L.Ed. 748.

The plaintiff is entitled to judgment in accordance with the prayer of its petition.