**AETNA OIL CO. v. GLENN, Collector of Internal Revenue.**

No. 600.

District Court, W. D. Kentucky, Louisville Division.

Feb. 14, 1944.

Louis Seelbach, W. W. Crawford, and Raymond Schultz, all of Louisville, Ky., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Courtnay C.

Hamilton, Sp. Assts. to Atty. Gen., and Eli H. Brown, III, U. S. Atty., of Louisville, Ky., for defendant.

MILLER, District Judge.

The plaintiff, Aetna Oil Company, brought this action to recover from the Collector of Internal Revenue $1,000 which it claims it was compelled to pay following an erroneous deficiency income tax assessment for the calendar year ending December 31, 1939. Claim for refund was duly filed and thereafter disallowed.

In January 1937 the plaintiff entered into a license agreement with Gasoline Products Company, Inc., effective as of January 1, 1937, by which the plaintiff was licensed to use certain cracking patents, for the use of which the plaintiff was to pay three-tenths of one cent per gallon for gasoline cracked by the plaintiff. The license agreement also gave to the licensee the option to commute the payment of future gallonage royalties by an annual lump sum royalty payment, which, according to the amount paid, permitted a specified maximum production for a twelve months' period, provided, however, that if after making such lump sum royalty payment the licensee should, before the expiration of the succeeding twelve months' period, produce under the cracking operations license thereunder more than the total gallonage permitted, then the licensee should pay gallonage royalties at the rate of 3/10ths of one cent per gallon upon any amount in excess thereof. It further provided: "Licensee shall, however, be entitled to no credit or refund in the event that 'cracked gasoline output' from the pyrolytic cracking operations licensed hereunder for the twelve months' period shall be less than the elected specified quantity in respect of which lump sum commuted royalty payment shall have been made." The Aetna Oil Company decided to commute the future royalty payments which would be due under the agreement by making a lump sum payment, which would permit an annual production thereafter of 200,000 barrels, and on January 6, 1937, it and the Gasoline Products Company entered into a written supplemental agreement effective as of the 1st day of January 1937, which provided in part by Paragraph 1 thereof as follows:

"Now, Therefore, for and in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto covenant and agree as follows:

"1. Licensee hereby elects, in accordance with the terms and provisions of Paragraph (C) of Section Third of said License Agreement, to commute the payment of future gallonage royalties for 200,000 barrels of 'cracked gasoline output' per year and to pay for said commuted license the sum of One Hundred and Twenty Thousand Dollars ($120,-000.00). Said payment shall be made in six equal installments, the first of which shall be paid by LICENSEE to GASOLINE upon the execution of this agreement and the five remaining installments shall be paid in six month intervals thereafter next succeeding, together with four per cent (4%) interest per annum on the unpaid balance."

This Supplemental Agreement also provided by Paragraph 4 thereof as follows: "4. If Licensee shall fail to make any payments provided for, or any part thereof, when due or shall fail to perform any other of the covenants of this agreement by it to be performed, GASOLINE may terminate this Supplemental Agreement and/or said License Agreement in accordance with the terms and conditions of Section NINTH of said License Agreement."

Section Ninth of the License Agreement so referred to is as follows:

"Ninth: Termination.

"If Licensee shall fail to pay royalties or make other payments herein provided for, or any part thereof, when due, or shall fail to perform any other of the covenants of this agreement by it to be performed, GASOLINE may terminate this agreement and all its obligations thereunder and all rights, privileges, authority and license hereunder granted to LICENSEE, by giving sixty (60) days' written notice to LICENSEE to that effect, at the end of which time this agreement shall terminate unless during said time LICENSEE shall have made good such default; provided, however, that such termination shall be without prejudice to the recovery by GASOLINE of any royalties then already due, or any rights of action on account of the failure of LICENSEE to perform any of the covenants or agreements of LICENSEE herein contained."

The Supplemental Agreement was executed by both Gasoline Products Company, Inc., and the plaintiff. Plaintiff paid in

964

1937 and in 1938 the amounts due in said years in accordance with the terms of said agreement, and in 1939 it paid the remaining $40,000 due in that year. In computing its income tax for the calendar year 1939 the plaintiff took credit for this last $40,000 payment as a corporation dividends paid credit under Section 13(c) of the Revenue Act of 1938 as amended by the Revenue Act of 1939. This credit so claimed by the taxpayer was disallowed by the Commissioner which resulted in the additional income tax of $1,000 which was assessed by the Commissioner and paid by the plaintiff.

Section 13 of the Revenue Act of 1938 as amended by the Revenue Act of 1939 levies a tax upon the net income of certain corporations, the net income of which is more than $25,000, and provides by Section (c) thereof as follows:

"(c) General rule.—The tax computed under this subsection shall be as follows:

"(1) A tentative tax shall first be computed equal to 19 per centum of the adjusted net income.

"(2) The tax shall be the tentative tax reduced by the sum of—

"(A) * * *

"(B) 2½ per centum of the dividends paid credit provided in section 27, but not to exceed 2½ per centum of the adjusted net income."

Section 27 of the Act so referred to deals with corporation dividends paid credit and by subsection (a)(4) thereof provided as follows: "Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind, if such amounts are reasonable with respect to the size and terms of such indebtedness. As used in this paragraph the term 'indebtedness' means only an indebtedness of the corporation existing at the close of business on December 31, 1937, and evidenced by a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust, issued by the corporation and in existence at the close of business on December 31, 1937, or by a bill of exchange accepted by the corporation prior to, and in existence at, the close of business on such date. Where the indebtedness is for a principal sum, with interest, no credit shall be allowed under this paragraph for amounts used or set aside to pay such interest. A renewal (however evidenced) of an in-debtedness shall be considered an indebtedness."

See 26 U.S.C.A. Internal Revenue Acts, Pages 1005 and 1021.

It is claimed by the Commissioner and by the defendant herein that the $40,000 so paid by the taxpayer in 1939 can not be properly taken as a credit under these sections of the Revenue Act because (1) it was not a payment on an "indebtedness", and (2) even if it was a payment on an indebtedness, such indebtedness was not evidenced by "a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust, issued by the corporation and in existence at the close of business on December 31, 1937."

The parties appear to be substantially in agreement as to the proper meaning of the term "indebtedness" as used in the statute. In its strict legal significance the word "indebtedness" applies to an obligation arising from contracts, express or implied, and in this sense is defined as being a sum of money due by certain and express agreement; that for which an action of debt will lie. In its broader and more general sense it is defined to be that which is due from one person to another; that which one person is bound to pay or perform to another, in which sense it may include every obligation by which one person is bound to pay money, goods, or services to another. Commissioner of Internal Revenue v. Tennessee Co., 3 Cir., 111 F.2d 678; Commissioner of Internal Revenue v. Park, 3 Cir., 113 F.2d 352; Gilman v. Commissioner of Internal Revenue, 8 Cir., 53 F.2d 47, 49, 80 A.L.R. 209. The definition of the term includes the essential elements of the existence of an actual liability which must in all events be payable either at that time or at some future time; in other words, an unconditional obligation to pay. As was pointed out in Gilman v. Commissioner, supra, the obligation in that case was not an indebtedness because the payment of the same was contingent upon the payee's being alive at the maturity of the instrument. The defendant recognizes this meaning of the term but contends that under the instrument in question the $120,-000 obligation of the taxpayer was not unconditional, and therefore not an indebtedness. This does not appear to be a correct construction of the instrument. On the contrary, the Supplemental Agreement imposes an absolute and definite ob-

ligation on the plaintiff to pay the sum of $120,000 in six installments of $20,000 each falling due semi-annually. It is true that Section 4 of the Supplemental Agreement gave Gasoline Products Company the option to terminate the Supplemental Agreement and the License Agreement if the taxpayer failed to make any of the payments provided for, but such a termination was governed specifically by the terms and conditions of Section Ninth of the License Agreement. Section Ninth provides that the termination of the License Agreement "shall be without prejudice to the recovery by Gasoline of any royalties then already due, or any rights of action on account of the failure of Licensee to perform any of the covenants or agreements of Licensee herein contained." This wording must be construed in connection with the other provisions of the License Agreement which call for the payment of a royalty of 3/10ths of one cent for each gallon of cracked gasoline output, payable monthly as disclosed by the licensee's monthly reports of its operations. It clearly means that if the license agreement was terminated none of the royalties which had already accrued during the preceding months would be forfeited. The accrual of the obligation to pay in the present case occurred upon the execution of the Supplemental Agreement, and the royalties due thereunder were certain and definite, although payable later, regardless of what happened in the future. It was possible under the terms of the license agreement that the royalty payment of $120,000 might be increased to some extent by small additional payments in succeeding years, if it occurred in such years that the Aetna Oil Company produced more than 200,000 barrels of cracked gasoline in any such year. In other words, the payment of $120,000 was the minimum royalty payment, regardless of how little the Aetna Oil Company used the patented process in any succeeding year, but it was not necessarily the maximum royalty payment that the Aetna Oil Company might be obligated to pay. I do not believe that Section Ninth of the License Agreement can be construed as meaning that the Aetna Oil Company could fail or refuse to make any of the installment payments called for and thereby automatically release itself from the unpaid portion of the $120,000 obligation. It would be a most unusual and strained construction to hold that a debtor can re-

lease himself of his indebtedness under a contract by breaking the contract himself. Section Ninth merely permits the licensor to terminate the agreement without prejudice to existing claims; it in no place forfeits or cancels any rights which it has previously acquired. The term "without prejudice" would have actually the opposite meaning from what is generally understood by the use of the term, if we accept the defendant's contention on this point of the case. The right to collect the $120,000 provided for by the Supplemental Agreement would accordingly not be cancelled or forfeited by a termination of the license agreement.

The remaining requirement under the statute is that the $120,000 indebtedness be evidenced by one of the written instruments designated in the statute, issued and in existence on December 31, 1937. Plaintiff claims that the Supplemental Agreement is a "note" within the meaning of the statute since it contains all of the elements to constitute a note in the legal sense of the term. It is agreed that it is not a negotiable note nor a negotiable instrument, but Section 27(a)(4) of the Revenue Act does not require the instrument to be a negotiable one. The essential elements of a note appear to be the written unconditional promise to pay another a certain sum of money at a certain time, or at a time which must certainly arrive. No particular form is necessary so long as the instrument embodies these essential characteristics. 10 Corpus Juris Secundum, Bills and Notes, § 7, pages 413-415; 7 American Jurisprudence, Subject Bills and Notes, Section 11 Page 795; Equitable Trust Co. v. Taylor, 146 App.Div. 424, 131 N.Y.S. 475; compare Sections 3720b-1, 3720b-5, and 3720b-6, Carroll's Kentucky Statutes, 1936 Edition; Sections 356.001, 356.005, 356.006, Ky.Revised Statutes, 1942 Edition. The Supplemental Agreement contained all of these essential elements. It sets out the plaintiff's express obligation to pay to the Gasoline Products Company the definite sum of $120,000 in installments coming due at definite times in the future. There is nothing further to be done by the payee in order to make the obligation a binding one. It is true that it contains other provisions than those required to be present in order to constitute a note, but such provisions in no way destroy the existence of the essential ones above referred

to. Even in the field of negotiable promissory notes, it will be observed by reference to the sections of the Kentucky Statutes above referred to that the existence of collateral promises or obligations on the part of the maker of the note, or even additional rights conferred upon the payee by the terms of the instrument, or the failure to include other elements than those referred to above, does not prevent the instrument from being a negotiable note. The defendant contends that the written instrument is a contract rather than a note. This is merely a use of words rather than a real distinction. The instrument is a contract, but every negotiable note and nonnegotiable note must be a contract before it can qualify as a note; it must contain the essential elements of a contract, namely, an agreement voluntarily entered into between competent parties upon legal consideration on a legal subject matter. In order to constitute a note, the contract must also be in writing signed by the maker and call for the payment of money at a definite time rather than the delivery of goods or the performance of services. It is also distinguished from the usual type of bilateral executory contract in that it is executory on one side only, with the entire consideration having been passed and executed by the party who is entitled to call for the performance. Such is the exact type of contract that exists in the present case. Defendant's contention might be well taken if we should confine ourselves exclusively to the question of terminology. The statute refers to a "note", which in the ordinary mercantile meaning is a short written instrument containing a promise to pay a certain person a certain sum of money at a certain time in the future, without introductory paragraphs and additional collateral agreements. But the statute must be construed according to its purpose and with a consideration of the circumstances existing at the time of its enactment. The purpose of this section of the statute was to limit the credit provided to cases where the indebtedness was an actual bona fide one, resulting from actual transactions in the past as reflected by the books and records of the corporation contemporaneously made. The use in the statute of the several words "bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust" indicates that no particular type of

a written instrument was required so long as the indebtedness was actually evidenced by a written instrument of some type containing the elements of an unconditional promise to pay. The same situation is presented here as was before the Court in Chess & Wymond v. Glenn, Collector, D. C., 40 F.Supp. 666, where it was pointed out that the statute under which the exemption was being claimed was not in existence at the time when the actual transaction occurred which prevented the transaction from being formulated so as to strictly comply with the terms of the statute subsequently enacted. As was pointed out in that case, the Court should not require exact compliance with the statutory pattern in every detail, but should give the statute a liberal construction so as to include such transactions as contain the necessary elements, regardless of technical form. Applying such principles to the present case, the Supplemental Agreement upon which the taxpayer relies, containing all of the essential elements of a note, is accordingly held to satisfactorily meet the requirements of the statute.

Judgment will be entered for the plaintiff. Counsel for plaintiff will draft and tender for entry Findings of Fact and Conclusions of Law in accordance with the foregoing views and also formal judgment.