**VALSPAR CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.**

No. 53, Docket 21046.

United States Court of Appeals
Second Circuit.

Jan. 18, 1949.

CLARK, Circuit Judge, dissenting.

————◆————

Roberts, Austin, Muller & McCook, of New York City (Charles A. Roberts and Robert O. Muller, both of New York City, of counsel), for petitioner.

Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack, A. F. Prescott and S. Dee Hanson, Sp. Assts. to Atty. Gen., for respondent Commissioner of Internal Revenue.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This appeal relates to a surtax on undistributed profits of the taxpayer Valspar Corporation for the fiscal year ending November 30, 1937. The question is whether the Commissioner should have allowed a credit to the taxpayer in assessing a surtax upon its undistributed net income for the above fiscal year because of the terms of a contract made by its wholly owned subsidiary Valentine & Company with a group of creditor banks to which Valentine & Company had given its notes in the sum of $1,133,300. The notes contained the following provisions relating to amortization and restriction of payment of dividends:

"The Company [Valentine] covenants and agrees with the respective holders of the Notes that for amortization of the

Notes the Company will apply to the redemption of the principal amount thereof, pro rata, on the first days of June and December in each of the calendar years 1935 and 1936 and on the first day of June in the calendar year 1937, an amount equal to one-third of the net income of the Company, as hereinafter defined and determined, in the last completed semi-annual fiscal period of the Company ended not less than three months prior to the redemption date. The term 'net income' shall mean gross income after reduction of all charges of proper character, including therein returns and allowances, cost of goods sold, operating expenses, interest (including interest on the notes), adequate provision for depreciation and reserves, taxes of every character (including Federal and other income taxes and any profits taxes) and proper amortization of deferred charges, all as determined and approved in accordance with sound accounting practice by the Auditors hereinafter referred to, provided, however,

"(1) that for the purpose of determining the amount, if any, to be applied to any such redemption the net income of the Company in any such last completed semi-annual fiscal period shall be deemed to mean only the amount, if any, by which (a) the net income in such semi-annual fiscal period is in excess of (b) any accumulated deficiency in net income of the Company in the period commencing December 1, 1934 and ending at the beginning of such semi-annual period, all as determined by said Auditors;

\* \* \* \* \* \*

"The Company covenants and agrees with the respective holders of the Notes that, so long as any of the Notes of this issue are outstanding:

\* \* \* \* \* \*

"(2) The Company will not declare or pay any dividend (other than one or more stock dividends and/or special dividends for the purposes contemplated by the Plan of Reorganization of The Valspar Corporation dated February 2, 1934, as modified) on any class of its stock except to the extent of the accumulated net earnings of the Company in excess of the accumulated net losses, if any, from December 1, 1934 to the close of the month immediately preceding the month in which any such dividend is declared \* \* \*; all as determined and approved in accordance with sound accounting practice by the Auditors herein referred to, who, in determining 'net earnings' and 'net losses' for the foregoing purpose, shall be guided in so far as they may consider appropriate, by the provisions hereinabove set forth in respect of 'net income' and 'deficiency in net income';

"(3) That the Company shall procure an annual audit report of the accounts of the Company to be made by Price, Waterhouse & Co. (or its successors in business) \* \* \*."

Prior to the close of the taxable year which ended November 30, 1937, Price, Waterhouse & Co. had not made an audit showing an excess of accumulated net earnings over accumulated net losses for any period after 1934. It did, however, make an audit dated January 13, 1938 showing a deficit on December 31, 1936 accumulated since 1934 of $63,115.56, a net profit for the year ending November 30, 1937, of $141,622.03, and a net accumulated surplus on November 30, 1937 of $78,506.47.

The Tax Court found that the petitioner was prohibited throughout its taxable year 1937 from paying any dividends in excess of its accumulated net earnings and that such net earnings on November 30, 1937 amounted to $78,506.47 less any income tax deficiency which might be determined in this proceeding for that taxable year. After some dispute as to how the tax deficiency should be computed, the Tax Court found that there was an undistributed net income available for dividends of $53,080.83, by reason of which it adjudged a deficiency in income tax of $26,812.33 for the fiscal year ending November 30, 1937, of which $6,908.82 being a surtax on undistributed profits is in dispute.

The Revenue Act of 1936, Sections 14 and 26, 26 U.S.C.A. Int.Rev.Acts, pages 823, 836, as amended retroactively by Section 501 of the Revenue Act of 1942, 26

U.S.C.A.Int.Rev.Acts, page 344, contains the following provisions:

"Sec. 14. Surtax on Undistributed Profits.

"(a) Definitions. As used in this title—

\* \* \* \* \* \*

"(2) The term 'undistributed net income' means the adjusted net income minus the sum of (A) the dividends paid credit provided in section 27, (B) the credit provided in section 26(c), relating to restrictions on payment of dividends. \* \* \*"

"Sec. 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \*

"(c) Restrictions on Payment of Dividends.—

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. \* \* \*"

Treasury Regulations 94, promulgated under the Revenue Act of 1936, provides as follows:

"Art. 26-2. Credit in connection with contracts restricting payment of dividends.—

\* \* \* \* \* \*

"(b) Prohibition on payment of dividends.—The credit provided in Section 26 (c) (1) is allowable only with respect to a written contract executed by the corporation prior to May 1, 1936, which expressly deals with the payment of dividends and operates as a legal restriction upon the corporation as to the amounts which it can distribute within the taxable year as dividends. If an amount can be distributed within the taxable year as a dividend—

"(1) in one form (as, for example, in stock or bonds of the corporation) without violating the provisions of a contract, but

can not be distributed within the taxable year as a dividend in another form (as, for example, in cash) without violating such provisions, or

"(2) at one time (as, for example, during the last half of the taxable year) without violating the provisions of a contract, but can not be distributed as a dividend at another time within the taxable year (as, for example, during the first half of the taxable year) without violating such provision—

then the amount is one which, under section 26(c) (1), can be distributed within the taxable year as a dividend without violating such provision. \* \* \*"

It appears from the foregoing that the Tax Court only allowed a credit to the extent that net profits for 1937 exceeded the accumulated net earnings as of November 30 of that year, and declined to grant a credit for the $53,080.83 shown by the audit of January 1938 to have been the accumulated net earnings on the ground that this sum could have been paid out as a dividend in the year ending November 30, 1937. We cannot accede to that conclusion in view of the fact that the contract of the petitioner with the banks prohibited the distribution of any dividends except from accumulated net earnings "as determined and approved in accordance with sound accounting practice by the auditors \* \* \*."

It is argued by the Commissioner that the contract did not prohibit the payment of dividends during the taxable year because the provisions of Section 26(c) (1) granting a special credit as well as the terms of contracts purporting to restrict dividend payments should, like other tax exemptions, be strictly construed. Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29. In the present case, however, the words embodied in the notes held by the creditor banks are clear and cannot be ignored without depriving the latter of the safeguards which were inserted to insure payment of their claims.

The decision of the Court of Appeals of the Sixth Circuit in Glenn v. Chess & Wymond, Inc., 132 F.2d 621, supports our view

as well as the ruling of the Board of Tax Appeals in Cotton States Fertilizer Co., 47 B.T.A. 748. In Commissioner v. John A. Wathen Distillery Co., 6 Cir., 147 F.2d 998, and Hobbs-Western Co. v. Commissioner, 8 Cir., 133 F.2d 165 it was held that there was no contract restricting the payment of dividends for the reason that such was not the express meaning of the language used in the respective contracts. This was clearly so and the decisions went no farther than to say that a restriction by implication was insufficient to satisfy Section 26(c) (1) of the statute. The only decisions upon facts closely approximating the contracts of the noteholders in the case at bar seem to be in accord with the view we have expressed.

The question of what during any period are net accumulated earnings may well be disputed and was in fact in dispute in the present proceeding. Indeed, it seems probable that there was so much doubt about the correct resolution of the factors which had to be considered that the petitioner made no payment on account of the principal of the notes in July 1937, though the contract specifically provided for a payment of principal and the petitioner's books indicated a substantial accumulated net surplus at the end of May, 1937. To make such a payment an audit, as here, was necessary. It was doubtless to avoid disputes and risk of weakening the security of the noteholders that the calculation of the net amount of accumulated earnings was left to a well-known and independent accounting firm. Without a precedent audit, the directors of the taxpayer were not authorized to distribute dividends. An audit after the expiration of the fiscal year, which was the only audit made, would not help to meet the restrictive obligation imposed upon the petitioner by the notes.

It cannot be said that the taxpayer might readily have complied with the statute here in question by declaring a dividend during its fiscal year and delaying payment until after the report of the auditors. That action would not have justified any credit, which depended not on dividends declared but upon the amount of "the dividends paid" during the fiscal year. See Section 14(a) (2).

There was nothing in the contract of the parties which required more than an annual audit. It may be that an audit in June, 1937, if showing a surplus available for dividends, would have required payment of such dividends in order to obtain a credit. So far as we can see neither the directors nor the creditor banks regarded such an audit, which would have been necessary to reduce capital obligations as well as to distribute dividends, as necessitated by the financial condition of the company as of May 31, 1937. Therefore, we are remitted to the broad terms of the contracts, requiring only an annual audit. Indeed, the Government's contention, which seems to accord with the finding of the Tax Court, is that November 30, 1937, was the key date. Until that date arrived, losses during the second half of the fiscal year might have offset prior earnings. We can discover no bad faith or tax evasion in awaiting the expiration of that period. If the audit had been obtained earlier, say in October, the petitioner could have paid a dividend and thus obtained the credit. We see no justification for treating their failure to do this as sufficient to dispense with the obligation under their contracts with the noteholders not to pay any dividends until an audit was obtained. See decision of the Board of Tax Appeals in Cotton States Fertilizer Co., 47 B.T.A. 748, which seems to us precisely in point. We cannot agree with the conclusion of the Tax Court that no audit was necessary under the terms of the contract, nor do we think that an audit earlier than the one made was demanded.

For the foregoing reasons, the order of the Tax Court adjudging a deficiency is reversed and the proceeding remanded with instructions to recompute the deficiency.

CLARK, Circuit Judge (dissenting).

Petitioner's contention here—accepted by my brethren—seems to me to prove altogether too much; I think it can be demonstrated to lead to the conclusion that every promise to pay dividends out of earnings, i. e., to do what the law requires, is an adequate basis for the statutory credit. And this is contrary to the original and leading case of Helvering v. Northwest

Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29, and the precedents following it.

The contract here involved, upon scrutiny, appears to come to this, that no dividends shall be paid except out of net earnings, as found and approved by the corporation's appointee. The significance of this last is not, of course, to be found in any suggestion that this auditing firm would not exercise an honest judgment; such a judgment we may well assume would be equally forthcoming from the corporation's own treasurer, had decision been left to him, or from its own board of directors in the ordinary course of voting upon dividends. Its significance is rather in the control which the taxpayer had over the time of certification. This corporation, as must be usual in the business world, knew from its own balance sheets that it was making a profit for the year; no one can doubt that had speed been requisite it could have arranged for a report from the auditors immediately at the close of business on the crucial day. Hence for our present purposes I do not see how the required certificate was anything more than another check beyond the judgment of the directors—a check valuable to the creditor because of its being in addition to that vote, but not otherwise changing the situation. For, if the existence of net earnings cannot be determined until the taxable year is already over, then the directors cannot act even in ordinary course until that time and all dividends therefore are within the contractual prohibition and the statutory credit.

In other words, the real force of the agreement is that no dividends be paid except out of earnings; if that is insufficient to justify the credit, I do not see how the additional requirement—which could be satisfied as promptly as a vote of the directors could be obtained—can be held to add more. For the additional provision is but another administrative safeguard, to be procured by the corporation, to make sure that the dividends have been legally declared out of earnings. It is at most in the nature of confirmation; it is subsequent, rather than precedent, in character. Notice, for example, the continued use of the word "approved" with respect to the action to be taken by the auditors.

I put it, therefore, that a promise not to pay dividends except out of earnings—however those earnings are to be proved or confirmed—cannot be that additional restriction against paying dividends which the statute contemplates. The statutory exemption must be strictly construed, the burden is on the taxpayer to show that he comes within it, and a restriction set by law is insufficient. Helvering v. Northwest Steel Rolling Mills, supra. So a restriction which would make it unwise and unlikely that a corporation should declare a dividend, but which falls short of a prohibition in terms, is insufficient to satisfy the statute. Railway Express Agency v. C. I. R., 2 Cir., 169 F.2d 193. Other pertinent illustrative cases are Hobbs-Western Co. v. C. I. R., 8 Cir., 133 F.2d 165, where the contract with the lender was that the dividends should be paid only from surplus profits and that, if declared, a like amount should be paid on the loan, and C. I. R. v. John A. Wathen Distillery Co., 6 Cir., 147 F.2d 998, certiorari denied John A. Wathen Distillery Co. v. C. I. R., 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998, where the contract was that dividends should not be declared without first "consulting" the officers of the bank who had made the loan. The cases relied on for the opposite view each have a difference from ours so striking as, I believe, to point the moral here, namely, that in the contracts there found adequate, it was expressly agreed that dividends should not be paid without the creditor's consent. Thus in Cotton States Fertilizer Co. v. C. I. R., 47 B. T. A. 748, 750, the written contract provided that the taxpayer would not declare or pay any dividend "without the prior written consent of R. F. C." (the creditor). To the same effect is Glenn v. Chess & Wymond, Inc., 6 Cir., 132 F.2d 621, where the letters forming the contract with the bank are set forth in the decision below, Chess & Wymond, Inc., v. Glenn, D.C.W.D. Ky., 40 F.Supp. 666, 668. The control did not, as here, rest with the corporation once the existence of profits appeared. The ease with which the statutory requirement can be fulfilled under the terms of the present decision is in marked

contrast to the universally strict construction heretofore given. See cases cited in Railway Express Agency v. C. I. R., supra.